[No. 3852.]

## J. M. SMITH *v.* THE STATE.

21  277
28  471
21  277
86t 497
31  152

1. MURDER—INDICTMENT.—See the statement of the case for an indictment *held* sufficient to charge the offense of murder.

2. PRACTICE—CHANGE OF VENUE.—Article 583 of the Code of Criminal Procedure provides two modes in which the application of an accused for a change of venue may be contested. The first is by filing the affidavit of a credible person attacking the credibility of the compurgators. The second is by filing the affidavit of a credible person attacking the means of knowledge possessed by the compurgators. Either one of the two grounds is sufficient to raise the issue to be tried. See the opinion *in extenso* for the substance of a controverting affidavit *held* sufficient to traverse the means of knowledge of the compurgators.

3. SAME.—Whether or not the controverting affiant is himself a credible person is an issue to be tried and determined by the trial judge. His credibility can not be impugned merely upon the ground that he was the physician who attended the deceased in his last illness, and that he was a witness for the State in the prosecution of the accused for the murder of the deceased.

4. SAME—JURY LAW.—When there has been a failure on the part of the jury commissioners to select persons for jury service in the manner provided by Article 610 of the Code of Criminal Procedure, the trial court is authorized to order the requisite number to be summoned from the body of the county. In this case there is nothing to show that the special *venire* was or was not selected as required by said Article 610. In as much, however, as the writ of special *venire* in the case required the sheriff to summon the sixty persons whose names appeared on the list accompanying the writ, it is sufficiently manifest that the sixty men were selected before the writ issued. Moreover, the presumption obtains, in the absence of a contrary showing, that the names had been selected in the manner required by law.

5. SAME.—Objection that one of the venire men named in the list, was dead, and that another was beyond the jurisdiction of the court, is not sufficient to authorize the quashal of the *venire.*

6. SAME—ARRAIGNMENT.—The record entry of the arraignment of the defendant, conforming substantially to number 685 of Willson's Criminal Forms, is sufficient to show that the indictment was read to the defendant before he was required to plead to it, and this constitutes an arraignment.

7. SAME—EVIDENCE.—In as much as the correctness of a diagram of the *locus* of the homicide was established by the testimony of the delineator before it was offered in evidence, and before it was used by other witnesses in connection with their testimony, it was properly admitted in evidence.

8. SAME.—See the statement of the case for the testimony of the State's witnesses Garrett and Helms, as to the statements made to them by the

deceased, shortly after his injury, *held*, admissible as *res gestæ*, in as much as the said statements sprang out of the principal fact, tended to explain it, were voluntary and spontaneous, and were made at a time so near, and under such circumstances, as to preclude the idea of deliberate design, and so as to be regarded as contemporaneous.

9. Same—Case Stated.—The State's witness Garrett testified, on his examination in chief, that he, his uncle, and his brother were together, at the house of his uncle, when the fatal shot was fired; that about two minutes after the shot, the defendant stepped into the room, and the witness asked him if he heard the shot, and he said he did; that, while in the room, the defendant told witness's uncle something, but witness could not remember what his uncle told him about it. In this connection, the witness was asked, on re-examination, by the State: "Did not your uncle tell you, in the presence of the defendant, to wait until your mother came home the next morning, and she would tell you what to say about the shot?" *Held*, that the question, under the circumstances of the case, was competent, in view of the presence of the defendant, and the fact that what the witness was told by his uncle was superinduced by a colloquy between the latter and the defendant.

10. Same.—See the statement of the case for evidence *held* to have been properly excluded as irrelevant and immaterial.

11. Practice—Privilege of Counsel.—The extent to which counsel may read from books as part of his argument to the jury is a matter confided largely to the discretion of the trial judge. His action will not be revised on appeal, unless that discretion has been clearly abused, to the prejudice of the accused.

12. Same—Circumstantial Evidence—Charge of the Court need not instruct the jury upon the law of circumstantial evidence, unless the State relies exclusively upon that character of evidence. This, however, is not a case in which the inculpatory evidence is purely of a circumstantial character; and, even if it were, the accused would have no cause to complain of the refusal of the court to permit his counsel to read authorities upon the subject, in as much as the charge comprehended fully and sufficiently the law of circumstantial evidence.

13. Same—Privilege of Counsel.—See the statement of the case for remarks used by prosecuting counsel in argument, *held* not to be an abuse of the privilege of discussion, in as much as they were provoked and justified by the argument of the counsel for the defense. Moreover, they were legitimate as warranted by the evidence in the case.

14. Same—Special Charges of the Court however correct, as propositions of law, are properly refused if their substance is embraced in the general charge.

15. Murder—Fact Case.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

Appeal from the District Court of Denton. Tried below before the Hon. F. E. Piner.

A life term in the penitentiary was assessed against the appellant, upon his conviction for murder in the first degree, under an indictment, the charging part of which reads as follows:

"　*　*　*　*　* That J. M. Smith, on the thirteenth day of October, in the year of our Lord, 1885, with force and arms, in the county and State aforesaid, did then and there unlawfully, wilfully, and with his express malice aforethought, kill and murder one I. N. Fowler, by then and there shooting him, the said I. N. Fowler, with a gun, contrary," etc.

J. H. Fowler was the first witness for the State. He testified that he lived in Denton county, Texas. He knew the defendant, J. M. Smith, commonly called Matt Smith. The deceased, I. N. Fowler, commonly called Pete Fowler, was a neighbor of the witness. Witness, defendant, and deceased, in October, 1885, lived in the same neighborhood, between six and seven miles south east from Denton, in Denton county, Texas. Deceased came to the house of the witness about dusk on the evening of October 13, 1885, and asked witness to go with him to old man Reed's house to get a plow Mr. Reed had repaired for him. Witness, on the plea of fatigue, declined to go. Deceased remained at the witness's house fifteen or twenty minutes, and then started for his home down the road. Between three and five minutes after the deceased left witness's house, witness heard the report of a shot gun, fired at or about the house of Walter Cochran. Deceased's route home from witness's house was over the road leading from witness's house to Walter Cochran's, until a point nearly opposite Cochran's was reached, where the road forked. Thence the route to deceased's house lay over the south east prong of the road. About half an hour after the shot was fired, Mr. Helms and other persons came to the witness's house and informed him that his nephew, Pete Fowler, had been shot, and was then at Helms's house. Witness repaired to Helms's house immediately, and found Pete Fowler suffering from a gun shot wound through the left arm. Deceased told the witness where he would find his, deceased's, hat, and early on the next morning witness repaired to the forks of the road, near Cochran's house, and found the hat. The hat lay in the edge of the brush, out of the road, at the point where Pete Fowler left the road and was shot. Witness found the tracks of the deceased going to his home from the witness's house. Those tracks passed, at a disttance of four or five steps, a clump of bushes which stood on the south side of the main road. That point was near the forks of

the road, and nearly opposite Walter Cochran's house. The tracks turned south out of the road. Witness examined the cluster of bushes, and found, on the east side of them, the tracks of a person who had stood there for several minutes. The witness then saw the point in the road to which the party stepped from the ambush. Witness then traced the tracks of the party who had stood in ambush across the road to the north side. Thence witness followed it to some ground covered with "timbered grass." Thence the track continued a little east of north to a point where the party attempted to jump to the ridge in the middle of the road coming down from Cochran's house. The ground showed that the party in making that jump, slipped down. It also showed that, in his effort to jump from the ridge to the other side of the road, the party slided a short distance. This "slide" disclosed the well defined impression of a square toed number seven or eight boot or shoe, run down at the right heel. That track was made by the same boot or shoe that made the tracks behind the clump of bushes near the forks of the road, and the tracks in the road in front of the tracks made by deceased when he turned south from the road to the place of the shooting. The last the witness could distinguish of the tracks they showed that the party making them was going towards Walter Cochran's house, which stood near the forks of the road, and about two hundred yards from the place of the shooting.

The defendant, at the time of the assassination, was living at Walter Cochran's house. The deceased then lived on the defendant's place, which was situated about four hundred yards east of south of Walter Cochran's house. The state of feeling between the defendant and the deceased at the time of the assassination was not good. They had had considerable trouble about the possession of a house which the deceased had rented from the defendant. They had several law suits over the possession of that house, one of which culminated in a fight in the court house. Fowler, the deceased, retained the possession of the rented premises, and in May, 1885, defendant, until then living in the same house, moved to Walter Cochran's house, where he has since lived. Defendant and deceased had known each other about three years at the time of the assassination.

Cross-examined, the witness testified that he went to Helms's house as soon as he was informed of the shooting of the deceased, and that deceased was at Helms's house. Witness remained at Helms's house about one hour, when he went to the

house of his son-in-law, Jerry Scott, to get horses to go to town for the officers. Witness did not go to town himself, but sent his son Charley and Sol Carpenter. From Jerry Scott's house witness went to Mr. Reed's house to get a gun. Witness remained at Reed's but a short time, whence he went to the house of Reese Thomas. and thence home, remaining at the latter place until day. Witness's wife passed the night at Helms's house, attending upon deceased. Witness did not tell Reed, on the day after the assassination, that deceased was in the habit of wearing a pistol. There was no trouble existing between the witness and the deceased.

Re-examined by the State, the witness testified that the night of October 13, 1885, was a moonlight night until the moon set, which it did between two and a half and three hours after dark. The moon was shining brightly when the witness went from home to Helms's house to see the wounded man. A person could then recognize a man with whom he was well acquainted, at a distance of forty yards. The road, at the place of the shooting, ran east and west. The moon, at that hour, was in the west, and shone down the road. The report of the gun was followed by the shouting or hallocing of a person or persons, the barking of dogs, and the ringing of a cow bell. The shot appeared to have been fired at a point near and north east from Walter Cochran's house. Witness could find no tracks between the road running east and west and the point where he found the "slide," the intervening ground being grassy. The road was sandy and dry, and was considerably traveled.

James Garrett was the next witness for the State. His, in part, is the testimony alluded to in the eighth head note of this report. He testified that, in October, 1885, he lived between four hundred and five hundred yards south of the house of Walter Cochran. Helms then lived three hundred yards west from the witness. Witness and his wife were at Helms's house when the fatal shot was fired on the night of October 13, 1885. They left no one at home. A short time after dark on this night, or at about seven o'clock, witness heard the report of a gun which appeared to him to have been fired near the house. Within the next fifteen or twenty minutes, deceased pushed open the door of Helms's house and stepped into the room occupied then by witness, his wife, and Helms's family. As he stepped in at the door, he exclaimed: "O Lordy! My arm is shot off." Helms said: "I reckon not. I see that you still have both arms."

Helms then asked deceased who shot him, and deceased replied:
"Matt Smith shot me." Deceased then asked for a pallet,
which was immediately prepared for him. Witness proceeded
to pull off the deceased's coat, and the deceased proceeded to tell
how the shooting occurred. He said that he went to old man
Fowler's house to take Mr. Fowler's mail. When he reached
the forks of the road on the way home, defendant stepped to
the middle of the road from behind a clump of bushes south of
the road, threw a double barreled shot gun on him and said:
"Throw up your hands, you d——d son-of-a-b——;" that he then
attempted to run, when defendant shot him. He said further
that the moon was shining squarely in the face of the defend-
ant, who wore no hat, and that he plainly recognized and knew
him. Deceased was panting and appeared to be out of breath
and very much frightened when he stepped into Helms's
house. His left arm was bleeding. Witness took the deceased's
coat off for him and hung it up. The coat contained nothing
but some letters. Witness saw no weapon of any kind on the
person of the deceased. Witness went for a doctor within five
minutes after deceased arrived at Helms's house. The state-
ment made by deceased as to the manner of his shooting was
made before the witness went after the doctor. The moon was
about two hours high at the time of the shooting, and was bright
enough to enable a man to recognize an acquaintance at the
distance of thirty or forty yards. Deceased was shot on the
back part of the left arm. The missiles fired from the gun were
duck shot. There was no road leading from the fork of the
main road directly to Walter Cochran's house.

Constable J. A. Ball was the next witness for the State. He
produced the following diagram, which he testified was a sub-
stantially correct sketch of the alleged place of the shooting,
and its vicinity.

Continuing, the witness, Ball, testified that he arrested the
defendant on the fourteenth day of October, 1885. Witness saw
the deceased on the night of October 13, 1885, at the house of L.
R. Helms. He was then suffering from shot gun wounds in his
left arm. Sixty or seventy duck shot had entered the back of
the left arm, the wound covering the space which extended from
a few inches above the elbow. Witness had known the defend-
ant and the deceased for several years, during which time they
lived in the same neighborhood, in Denton county, about seven
miles south east from the town of Denton. Witness went to the

Statement of the case.

J. M. Smith's house, in which deceased lived.

Walter Cochran's house.

150 yards from W. Cochran's to the fork of road.

Road.

Road.

250 yards from cross roads to Garrett's.

J. Garrett's house.

M. Gray's house.

Road.

Cluster of bushes.

Road running east and west. 300 yards from J. H. Fowler's to cross roads.

450 yards from J. H. Fowler's to J Garrett's

½ mile from Helm's to Garrett's

L. R. Helm's house.

I. H. Fowler's house.

J. H. Fowler's field.

Fowler field.

alleged place of shooting, near the forks of the road, on the morning after it occurred. From this point the witness testified as follows: "I did not go up to the place where the roads cross, as shown on the diagram, but I went near there, and crossed on the north side of the road running east and coming down from widow Gray's and the road running east and west on the diagram. I crossed a small angle of prairie lying between the road coming down from widow Gray's, and the road running east and west, and where these roads cross. I went across this angle in the direction of Walter Cochran's house, and in about twenty or thirty yards I came to a road which came from widow Gray's and leads to Matt Smith's place. I saw, when I got to this road, where some body had attempted to jump over to the ridge in the middle of this road, and had slipped down. I noticed where the same party had attempted to jump from the middle of the road to the far bank on side of the road, and again slipped down. The party who attempted to jump the road left one well defined track in the road where he had slipped back. That track looked fresh, and was made by the right foot. I measured the track, and it was made by a boot or shoe with a square toe, and the sole of the boot or shoe showed to be a thin sole. The toe of the track was broad, and showed to have been made by a number seven or eight boot or shoe. It showed also that the right heel was run down. The outside of the heel showed the impression of tacks.

"I went up to Walter Cochran's house, where Matt Smith was staying, and arrested him about sun up. Matt Smith then had on a pair of boots, either a number seven or eight, and the right heel was run down, and there were tacks which showed on the outside of the boot heel, the leather having worn off. I noticed the tracks he made the morning I arrested him. I walked behind him in Walter Cochran's yard immediately after I made the arrest, and noticed the tracks which he made. I afterwards measured his boots, and I had the measure which I took of the tracks in the road and of his boot, and the size and shape of the boot, and the measure of the same corresponded with, and appeared to be the same, that made the track in the road. The two measures I took were burned up when my house was destroyed by fire last December. On Sunday after I made the arrest I went to Walter Cochran's house for the purpose of making a search. I went in to the only up stairs room in the house, which room was occupied by Matt Smith. I searched every thing in

the room, including the clothing. I found some duck shot over casing of a window in that room. I found the shot, about two dozen in number, I suppose, wrapped in a piece of writing paper. I have since lost this paper, but remember the substance of the writing on the paper. It was a note from Bob Allen to J. M. Hazle, telling him that he must pay a certain account due by him, Hazle, to the writer, Allen. It was dated October 12, 1885. I took the shot out of the paper and gave them to sheriff McDonald for safe keeping. I took the paper to Mr. Hazle's house, and showed it to him. I found a gun on Hazle's place. I took the loads of shot out that gun, and found that one barrel contained buck shot, and the other contained shot similar to those found in the paper over the window, which were similar shot to those with which Pete Fowler was shot."

Cross-examined, witness said he left town after twelve o'clock on the night of October 13, 1885, when he went to Helms's house. The moon was not then shining. Sol Carpenter and young Fowler came after witness, and went back with him. The soil on the road at the place of the shooting, like the soil on all cross timber roads, was sandy. The road at the point opposite Cochran's house was timbered on both sides, the timber on the south side, near the point of the shooting, being smaller than on the north side. A thick cluster of bushes stood on the south side of the road near the forks. Witness did not examine the ground about the cluster of bushes for tracks. Sol Carpenter and other parties were on that ground when witness arrived, and it was the witness's understanding that he and others had been tracing tracks.

J. M. Hazle testified, for the State, that the defendant was at his house on the twelfth day of October, 1885. Defendant was surety on a note, owed by the witness, and he came to witness's house on that day to get witness to convey in trust, some cotton to secure him. When he reached the gate as he was leaving, he asked if witness had any tolerably heavy shot, and could spare him a load or two. Witness got and gave him some thing more than a table spoonful of number 4 duck shot. This shot the witness wrapped in a letter which he that day received from Bob Allen about some money witness owed him. On the Sunday following the shooting of the deceased, J. A. Ball had that letter at the witness's house, and the witness saw it again on the examining trial of the defendant. When Ball showed the witness the Bob Allen letter on the Sunday after the shooting, it con-

tained a few shot about the same in size as those witness let defendant have on the day before the shooting. Had defendant asked for buck shot, witness would have supplied him. He did not think of the possible use to which defendant designed them.

Walter Cochran testified, for the State, that, at the time of the shooting, he was cultivating a part of the defendant's farm, and the defendant was boarding with him. About five o'clock in the evening of the day of the shooting, the defendant passed through the witness's field. He had his rifle gun on his shoulder. He talked a few minutes with witness, and went on, remarking that he was going to his barn to feed his hogs. Witness did not see the defendant again until some little time after dark. When he quit work that evening the witness went home, and cooked and ate his supper. No one was at the witness's house on that night, save the witness and his two little nephews, the sons of the widow Gray. Witness's wife went to Charley Gray's house on that evening to sit up that night with Gray's sick daughter. After supper was over, and while the witness was washing the dishes he heard the loud report of a very large gun, fired about two hundred and fifty yards distant from his house. It was then after night. Witness did not then know in what direction from the house the gun was fired, but his dogs gave mouth, and ran towards a point south of the house, indicating that as the direction of the shooting. The defendant was not at the witness's house when the gun was fired, and witness had not seen him since he passed through the cotton field during the evening. He came into the witness's house between three and five minutes after the shot was fired. Witness did not see him until he got inside of the house, and did not know from which direction he came. Witness asked him if he wanted supper. He replied that he was not feeling well, and would take only a cup of coffee. One of Mrs. Gray's little boys said some thing when defendant entered, but witness did not understand what. The defendant, after drinking his cup of coffee, sat down by the fire place and smoked. When he got up to go up stairs to bed, he asked witness to say nothing about hearing the report of a gun, as he predicted trouble in the neighborhood. Witness saw no more of defendant until next morning. Witness's house had a large room and a shed room down stairs, and a single room up stairs. Witness and his family occupied the large room down stairs, and cooked in the shed room. Defendant occupied the room up stairs. The shed room, with door and window, was on the east

side of the house. The door of the large room opened west, and defendant entered the house at that door. Defendant did not have his gun when he came home on that night. Witness had no idea what he did with it. He generally, if not always, carried his rifle with him, for the purpose, he said, of killing hawks and squirrels, but witness had never known of his killing either hawks or squirrels.

Cross-examined, the witness testified that the report of the gun was followed by considerable hallooing, dogging, and running of cattle. That noise occurred north east of witness's house. The cattle were run and dogged by Garner Coleman, whose voice the witness recognized. Witness heard the defendant climb the fence on the north east side of the house, on his return to the house just after the shot was fired. That fence stood about fifteen or twenty steps from the door.

Rudolph Gray testified, for the State, that he was ten years old. He and his little brother, eight years old, stayed at the house of their uncle, Walter Cochran, on the night of the shooting. Just after supper was eaten at Cochran's house, and while Cochran was washing the dishes, a gun was fired south of the house. The report was a loud one. Witness stepped to the east door and looked out, but seeing no one, went back into the kitchen. Within two minutes the defendant stepped into the house, through the west door, and passed into the kitchen, where he threw his hat on a trunk. Witness asked him if he heard the report of the gun, and he replied that he did. Defendant then smoked his pipe, and went to bed. The defendant, while in the room, said something to Walter Cochran, but the witness could not recall what his uncle said to him about it. At this point, the State's counsel asked the witness if his uncle Walter, in the presence of the defendant, did not tell him to say nothing about the shooting until next morning, when his mother came home, and that she would then tell him what to say. To this question the defendant objected. (The statement of facts recites that the objection was sustained, but the bill of exceptions shows that it was overruled.) Witness replied that his uncle told him something while the defendant was in the room. Witness heard no noise, nor the sound of any person walking in the yard, before the defendant stepped into the house. The west door of the house fronted a gap in the fence. Witness, his brother, and his uncle Walter were in the shed room or kitchen when the shot was fired. There was a door opening east from the shed room,

through which the kitchen light shone.   Defendant entered the house through the door of the west, or large room.

L. R. Helms was the next witness for the State.   His testimony constitutes, in part, the subject matter of the ruling stated in the eighth head note of this report.   The witness testified that the deceased died at his house, in Denton county, Texas, on the fifteenth day of October, 1885, from the effects of a gun shot wound inflicted upon his left arm on the night of October 13, 1885.   Witness heard the loud report of a shot gun, at about eight o'clock, on the night of the said October 13.   James Garrett, his wife, witness, and his family, were present in a room of witness's house when that gun was fired.   Witness judged from the sound that the gun was fired in the neighborhood of Walter Cochran's house, which was situated between six hundred and eight hundred yards north east from witness's house.   About fifteen minutes later, the deceased pushed open the door and entered the witness's house.   In almost the same words used by the witness Garrett, this witness related what transpired, and what was said by the deceased as to who shot him, and the circumstances attending the shooting.

Doctor Crutcher reached the witness's house about thirty minutes after deceased did.   He applied cold water to the wounded arm, and in about an hour the bleeding ceased.   The doctor then administered morphine and whisky, of which, when he left, he left with the witness a supply, with directions how to give it.   Witness followed the doctor's directions explicitly, but the deceased died on the following Thursday, October 15, 1885. The witness partly undressed the deceased on the night of the shooting, and knew that he had no weapons on his person when he reached witness's house.   Sixty or eighty duck shot, took effect in the back part of the deceased's left arm.   They covered the space from four inches above to four inches below the elbow. Witness went to the house of J. H. Fowler, about three quarters of an hour after the deceased arrived at his, witness's, house, and informed the said J. H. Fowler that the deceased was at his house, wounded.   J. H. Fowler returned with the witness.   The moon was about two and a half hours high when the shot was fired, and it was light enough for the witness to distinguish an acquaintance at a distance of forty yards.

Cross-examined, the witness said that about the time he heard the shot fired, he heard some loud hallooing, the barking of dogs, and the ringing of a cow bell.   These noises seemed to proceed

from a point north east of Walter Cochran's house.    Old man J.
H. Fowler remained at the witness's house about an hour, per-
haps longer, on the night of, and after the shooting.    Witness
did not observe him when he left, but presumed that he went
home.    Witness did not go to the point where the shooting was
said to have been done, until between nine and ten o'clock of
the next day, at which time a large crowd had collected.    Wit-
ness, therefore, made no effort to trace the tracks.

Sol Carpenter testified, for the State, that, at about eight
o'clock on the night of October 13, 1885, some parties arrived at
his house and told him that Pete Fowler had been shot. Witness
was then in bed, having retired early because of fatigue.    He
got up at once and repaired to the house of Mrs. Helms, where
he found the deceased lying on a pallet in charge of Doctor
Crutcher.    Witness saw that deceased was shot in the left arm,
in the region of the elbow.    Witness went to town that night
after the sheriff, but, failing to find him, got constable Ball, who
returned with him.    The moon went down before witness
reached town.    Witness was informed of the locality on the
road where the shot was fired, and went to that ground at day-
light on the next morning.    The witness was here shown the
diagram in evidence.    He pronounced the same correct, and tes-
tified as follows:

"There is a road running east and west at and south of Wal-
ter Cochran's house, as it is shown on the diagram.    There is a
road running from near Walter Cochran's house south, and a
little west, just as is shown on the diagram.    That road crosses
the road which runs by J. H. Fowler's house, due east, as shown
by the diagram.    Where this road crosses the road running east
and west, there is another road turning off south east and run-
ning to Matt Smith's place, where Pete Fowler was then living.
There is a small road running east of J. H. Fowler's field, and
which comes from near the widow Gray's place, and runs into
the road which passes by J. H. Fowler's, and running east and
west.    About sixty or seventy yards north of where the road
from widow Gray's intersects, or runs into the road passing J. H.
Fowler's, there is a road which turns off and runs south east to
Matt Smith's place, as shown on the diagram.    The first place I
went to, the morning after the shooting, to look for tracks, was
the cross roads south of Walter Cochran's house.    There I looked
for, and saw, on the south side of the road, about twenty or
thirty feet west of the cross roads, a thick cluster of bushes.

Those bushes were not very tall, but they were very thick. I saw, on the south side of those bushes, the signs of tracks, as if some one had been standing there, and I noticed the ground broken. I saw where the party who had been standing behind those bushes stepped out into the road, where I could see the tracks plain. Then that party ran across the road, in the direction of Walter Cochran's house. I then crossed the road running east and west, and over a small piece of round prairie which lies near the cross roads, and in the angle of the road. I followed the course the party took, by following the signs he made on this piece of prairie, till I reached the road which runs from the road east of J. H. Fowler's field down to the place owned by Matt Smith, and where Pete Fowler lived. When I got near this road, and in three or four feet of it, I saw where the party jumped over on the ridge in the middle of this road, and I saw where he struck the bank on the edge and slided down into the road. I could then see the front part of the track plainly, but could not see, or make out, the rear part of the track. I saw where this party, after he had got up on the ridge, jumped over to the bank on the north east side of the road, and again slided back. I noticed one well defined track on top of the bank, which showed to have been made by the right foot. It was made by a square toed number seven or eight boot or shoe. The heel showed to be run down on the outside, leaving the impression of the tacks.

"From the point last described, the trail of the party led towards Cochran's house. I then went up this road (the one on which the "slides" were found) to within ten or fifteen steps to the place where the road forked off from the road east of J. H. Fowler's field, and which track led to Matt Smith's place, and across the road running east and west. I there found these same tracks going towards Matt Smith's place. I followed those tracks down the road to where they crossed the road running east and west. There the track crossed the road and went down the road leading to Matt Smith's place, about ten feet, where they turned out of the road, on the west side; and then I traced them outside of and up (south) the road running by J. H. Fowler's to the south side of the cluster of bushes described, where the party seemed to have stood some time. I then saw where the party stepped out in the road running east and west, and then followed the tracks again up to where the "slide" was made by jumping the road. All of the tracks described were

made by the same party.    I saw the deceased's track about four or five steps west of the tracks of the party who had stood and stepped into the road from behind the cluster of bushes.    I saw the deceased's track where he stopped and turned around, and stepped out of the road on the south side.    Fowler's track was going east, the way he would have to go home from J. H. Fowler's house.    I then followed Pete Fowler's track to where he turned out of the road, beyond which point I found blood, and easily traced him thence to Garrett's house, on the window sill and door step of which I found blood stains, and abandoned the trail."

Continuing his testimony, the witness said that he saw the defendant make several tracks after his arrest, which tracks corresponded literally, in shape, size, and defect of heel with the tracks he saw at the places, and trailed, as narrated.    The defendant then wore a pair of light soled, square toed boots, the right one being run down on the outside of the heel, and having protruding tacks.    A party standing in the road, opposite the cluster of bushes described, facing west, at the time the shot was fired, on the night of October 13, 1885, would have caught the reflection of the moon directly in the face.    The moon was about an hour and a half high when the witness was called from his bed on the night of the shooting, and it shed light enough to enable the witness to recognize an acquaintance at a distance of eighty feet.    Ball arrested the defendant on the morning after the shooting.    After making the examination of the tracks on the ground adjacent to Cochran's house, witness went to the place that belonged to the defendant to look for a gun.    He found a rifle buried about two feet under shucks in a crib.    That rifle the witness placed in the south east corner of the crib.    He did not know to whom it belonged.    Reece Thomas was at the crib a short time after witness found the gun.    It was after sun rise on the morning after the shooting that witness found the gun. Deceased and defendant had been on unfriendly terms for some time prior to the shooting.    Their ill feeling grew out of a law suit concerning the possession of the premises rented by deceased frcm defendant.

Cross-examined, the witness testified that the road running by J. H. Fowler's house was originally laid out and worked as a county road, but was not so worked at the time of the shooting. It was well used as a neighborhood road, and though somewhat grown up in bushes, was open enough to admit of wagon travel.

The soil was of light sand, such as would take and retain the impression of a foot, boot, or shoe. Witness saw no tracks on the road when he examined it early in the morning after the shooting, save the tracks of the deceased and the party who fired the gun. Low post oak timber flanked the road on the south side. The timber north of the road was larger, but the undergrowth was scantier than on the south side. Witness examined the tracks on the morning after the shooting, before constable Ball came on the ground. J. H. Fowler was on the ground while witness was examining the track. J. H. Fowler's track was larger, and in every way unlike the track of the man who stood behind the cluster of bushes. Witness saw news paper gun wadding in the road west of the point at which the party stepped from ambush into the road.

Reece Thomas testified, for the State, that he was at the barn on defendant's place at which the deceased lived, on the morning after the shooting. He saw the rifle of the defendant, which he knew, standing in the south east corner of the crib. Sol Carpenter was at the crib when the witness arrived. Witness and Carpenter made a careful search of the premises of Walter Cochran, and all about it, for a shot gun, but found none. Witness did not know of the defendant's owning a shot gun.

Mrs. I. N. (Pete) Fowler, the widow of the deceased, testified, for the State, that the deceased left his home about dusk on the night of October 13, 1885, to take some mail to witness's father, J. H. Fowler, who lived about 600 yards distant in a west direction. About an hour after the deceased left home to go to J. H. Fowler's, the witness heard the loud report of a gun fired at a point near Walter Cochran's house. Thirty minutes later witness saw her husband lying wounded in Mr. Helms's house. He died in that house on the Thursday following, which was the fifteenth day of October. Witness saw the defendant at the horse lot of the premises on which she and the deceased lived, about fifteen minutes before the deceased started to J. H. Fowler's. Defendant had some hogs in a pen at that lot, which he fed and attended to every morning and night. Witness did not see the defendant when he left the lot on that evening, nor did she see him again that night. Witness and her husband were then living in the defendant's house under a lease running from October, 1884, until October, 1885. Defendant lived with them from October, 1884, when they took possession, until May, 1885, when the unfriendly relations between him and deceased culmi-

nated in a law suit over the possession of the premises. Upon the conclusion of that law suit, the defendant removed to the house of Walter Cochran, and was living there at the time of the shooting. In going from the house occupied by witness and deceased, to the house of J. H. Fowler, it was necessary to pass by the horse lot in which the defendant had his hogs penned.

Doctor Crutcher testified, for the State, that he reached Helms's house at about nine o'clock on the night of October 13, 1885, and found deceased suffering greatly from a gun shot wound on the left arm. Between sixty and seventy number 4 duck shot struck the elbow from behind, shivering the elbow joint. The deceased was in the rigors of "tramatic" shock, the result of the wound, which was bleeding profusely. His pulsation was one hundred and forty, and his temperature was one hundred and two degrees. The normal pulsation of a grown person is from seventy to eighty, and the normal temperature ninety-eight and a half degrees. Witness removed the deceased's shirt sleeve, washed his arm, wrapped it in cloths, and applied cold water to stop the hemorrhage, and then gave a treatment to allay pain. He administered morphine in doses of from one-fourth to one-third of a grain at intervals of an hour and a half until three or four doses were taken, when the time was extended until the deceased was brought under influence, and then the intervals were extended to four hours. A stimulant of brandy, about an ounce at a time, was given at intervals of an hour and a half. The treatment was kept up throughout the night in an effort to counteract the shock. For the purpose of amputating the arm, Doctor Williams, of Denton, was called in on next morning, but the deceased, not having recovered from the shock, amputation was abandoned for the time, as too dangerous. The deceased failed to rally, afterwards and amputation was not undertaken at all, as it would only have resulted in expediting death. Amputation is never attempted by the best surgeons so long as the shock adheres to the patient. Amputation in this case would only have aggravated the shock, and, in all probability, the deceased would have succumbed under the operation. Failing to counteract the shock, the witness and Doctor Williams could do nothing more than continue the treatment, re-washing and applying an antiseptic dressing in order to preserve a good condition for amputation in the event of a rally. The antiseptic dressing was a compound of carbolic acid and water. Deceased grew worse and worse until he died on the evening of October

15, 1885, from the effect of the shock produced by the wound. Witness had often administered morphine to the deceased for chills. Witness was a graduate of the Louisville (Ky.) Medical College.

Doctor Williams was the next witness called by the State. He testified that he reached the deceased on the morning after the shooting, being called in to amputate the arm, in connection with Doctor Crutcher. He described the wound and the condition of the wounded man exactly as Doctor Crutcher did, and declared that to have undertaken to amputate the arm would have resulted only in the speedier death of the patient. He ascertained the treatment to which the patient had been subjected the previous night, and approved it as the proper, necessary, and best treatment in such cases. Witness and Doctor Crutcher washed the arm well, applied an antiseptic dressing, and wrapped it with absorbent cotton saturated with a solution of one part of corrosive sublimate to two thousand parts of water, and then wrapped the arm in iodiform gauze. There was no pulsation in the arm below the elbow. That condition was caused by an obstruction in the artery. That obstruction was doubtless the result of compression of the artery. Witness called to see deceased again on the evening of the next day, October 15. He found him in a state of collapse, his temperature being one hundred and one and a half, and his pulsation one hundred and forty-four. Deceased died about fifteen minutes after the witness reached him; his death resulting from the shock produced by the wound.

J. H. Fowler, recalled by the State, testified that deceased brought him his mail on the night of the shooting, and asked him to go with him to Reed's to get his plow. Witness was tired, and was satisfied that Reed, who lived on his, witness's, place, had not finished the plow, and therefore declined to go. Deceased started home about fifteen or twenty minutes later, and the gun was fired within five minutes after he left.

Cross-examined, the witness testified that he did not tell old man Reed, on the morning after the shooting, that deceased always carried a pistol. Witness tried to borrow a shot gun from Reed, about two hours after deceased was shot, but did not stay all night at Reed's house. Witness's son-in-law stayed all night at Reed's, but witness declined the invitation to do so. From Reed's witness went to Reece Thomas's, thence to Helms's, where he remained a short time, and thence he went home, where he

remained until morning, when he went to the scene of the shooting near Cochran's.

Deputy sheriff Dave Ware testified, for the State, that he was with constable Ball when defendant's room, in Cochran's house, was searched on the Sunday after the shooting. The Allen note to Hazle, containing a few number 4 duck shot, was found secreted in the casing of the window. Hazle, on the same day, identified the note as one which he gave to defendant, with some shot, on the twelfth day of October, 1885. A shot gun was found at Hazle's house, from one barrel of which a load of duck shot, number 4, was drawn. A load of buck shot was drawn from the other barrel. The duck shot taken from the shot gun found at Hazle's were delivered to sheriff McDonald. The shot now in evidence, and held by witness in one hand, were the same identical shot. The shot in evidence, and now held in the witness's other hand, were the identical shot found over the casing of the defendant's room. A tablespoon would hold three and a half large loads of number 4 duck shot. In a tablespoonful and a half there are five full loads of such shot. Sheriff McDonald testified that he was with Ware and Ball on the Sunday defendant's room was searched, and Hazle was visited. His narrative was a corroboration of that of the witness Ware. The State closed.

Mrs. Walter Cochran was the first witness for the defense. She testified that the defendant commenced boarding at the house of her husband in May, 1885, and continued to board there until his arrest in October, 1885. Defendant occupied the only up stairs room in the house, in which room he kept all of his clothing. He owned a pair of shoes and a pair of boots. It was his custom to put on his old clothes to work in. Defendant did some wood hauling for the witness and for the widow Gray, on the evening of October 13, 1885, and witness remembered that he went up stairs before he did it, to put on his working clothes. He exchanged his clothes, but witness was unable to say whether he wore his boots or shoes. The widow Gray took dinner at witness's house on that day, and witness went home with her and remained over night. The defendant's habit of eating was variable. When he felt well he ate heartily. He rarely took more than a cup of coffee when complaining of feeling unwell.

Cross-examined, the witness testified that the defendant knew she would not be at home on the night of the shooting, as her absence for the night was talked of at dinner. After he had

hauled the wood the defendant got his rifle and went off east from the house, towards the point in the field where witness's husband was picking cotton.

The widow Gray testified, for the defense, substantially as did Mrs. Cochran, except that she affirmed that, when the defendant came down stairs, having donned his working clothes to wear while hauling the wood, he had on his old shoes.

Cross-examined, the witness testified that her feelings towards the defendant were cordial. Whether or not she was engaged to marry the defendant was purely and exclusively a matter of her business. Witness observed the defendant's feet when he came down stairs, just before hauling the wood, on the evening of the shooting, and she knew that she could not, as she did, have seen his socks if he had on boots. The State's counsel asked the witness if she was sure she saw that the defendant had on dirty socks on the evening of the shooting. Witness replied that she "chewed her tobacco but once." Witness was the mother of Rudolph Gray, the daughter of J. E. Coleman, and the sister of Garner Coleman. Witness's said father and brother, and her father-in-law, Matthew Gray, were witnesses in this case.

J. C. Reed testified, for the defense, that he lived on old man J. H. Fowler's place in October, 1885. About one hour after dusk, on the night of October 13—the night on which deceased was shot—witness heard the report of a shot gun, fired at or near Cochran's house. That shot was followed by hallooing, barking of dogs, and ringing of a cow bell. About an hour later J. H. Fowler came to witness's house and asked the loan of a shot gun, for the purpose, he said, of shooting a hawk. Witness told him that the pretense of shooting a hawk would not do. He then told witness that Pete Fowler had been shot. J. H. Fowler then left, but came back shortly and remained at witness's house until near day break. On the day after the shooting, J. H. Fowler told witness that he intended, but forgot, to ask the deceased on the night before, whether or not he had his pistol with him. He then remarked that the deceased usually carried his pistol. Witness had known the defendant for several years. Defendant had sustained the reputation of a peaceable, law abiding citizen.

Cross-examined, witness said he knew by hearsay that defendant and deceased had had trouble and a law suit about the rent of the defendant's house. Witness had heard of the defendant having trouble with others of his renters, among whom was one Mr. Spears. He knew also of law suits between defendant and

Bullard and Burris over the boundary lines of their respective lands.

Garner Coleman testified, for the defense, that he lived about six hundred yards east of Walter Cochran's house. About dark, on the night on which Pete Fowler was shot, witness's father, J. E. Coleman, rode up to witness's house and told witness that he had been out hunting his cows, but could not see well enough to drive them up. Witness got on his father's horse and went to a point east of Elm swamp, at which place, as indicated by the bell on one of the cows, the animals were to be found. Witness took his dogs with him. On his return with the cows, and when he reached the round prairie, about two hundred yards north east from Walter Cochran's house, the witness met the defendant. Witness recognized him at a distance of twenty yards. Defendant said that he was looking for a cow and calf which Bill Crook had turned out. After talking at that point for a few minutes, witness and defendant, the latter on foot, went down the road together. They presently separated, and before the latter could have gone farther than thirty yards from the point of separation, though witness could not see him through the brush, the witness heard the loud report of a shot gun fired about one hundred and fifty yards south of Walter Cochran's house. Witness was about two hundred yards north east of Cochran's house when the gun was fired.

Cross-examined, the witness admitted that, on the Tuesday night before this trial, he told the State's attorney and E. C. Smith, that he last saw the defendant on the night of the shooting, quite a half an hour before he heard the report of the gun, and that he did not know where defendant was when the shot was fired. That statement was falsely made, because witness was then afraid to tell what he actually knew of the whereabouts of the defendant. He was afraid of arrest as an accessory or accomplice to the murder of the deceased. Witness had been threatened with prosecution for the murder, and with death if he testified to what he knew on this trial. Witness made, to Dave Ware and Reece Thomas, the same statement he made to the State's attorney and E. C. Smith. He made the statement to Ware and Thomas before he was told that old man Fowler was threatening to have him arrested and tried as an accessory. Witness was not intimidated when he made the false statements to the county attorney and Mr. Smith. He knew Mr. Ferguson to be the county attorney at the time, and made the false state-

ment to him of his own volition. Witness started from his own house, on his father's horse, after the cows. He then heard the cow bells in Elm swamp, about a mile east of his house. Witness hallooed all the time he was driving the cows out of the swamp; the dogs were barking, and the cow bells ringing. He met defendant on his return from the swamp, about two hundred yards north east of Walter Cochran's house. The State's counsel asked witness if he did not tell E. C. Smith, before this trial, that he last saw the defendant about sun down on that evening. Witness replied that he did so state to Smith, and that he adhered to that statement.

Re-examined, the witness said that when he made the false statements admitted by him, to the several parties named, he was under attachment as a witness, had not yet entered into recognizance, and to that extent was in arrest. Witness had been in town but an hour. He had learned that defendant's counsel would apply for a continuance of the case, and had stated the fact to which he would swear. Old man Fowler heard what witness said, and said that if witness so testified, he would have witness arrested as an accessory. Witness removed to Cooke county a short time before this trial, but had been in Denton since the present term of court had been in session.

Re-cross-examined, the witness stated that he knew when and why the defendant was arrested, but he told no one what he knew of the defendant's whereabouts when the shot was fired. Witness had never, prior to this trial, told any one, except his wife and A. C. Owsley. Witness told Owsley in the jury room during the examining trial of the defendant, which was held three or four weeks after the shooting. Witness was not examined as a witness on that trial. Witness was friendly to the defendant. The widow Gray was the witness's sister.

J. E. Coleman testified, for the defense, that he went to the house of his son, the last witness, about dark, on the night that deceased was shot, and got his son to go to Elm swamp and drive up his, witness's, cows. Garner rode witness's horse, and took the dogs with him. Witness could hear the bells on the cows while Garner was after them. Witness went to the door twice, to hear which way the cattle were being driven. Garner had been gone some time when the witness heard the report of a gun, fired south east from where witness was, and south from Cochran's house. Garner and the cows were then north east

from Cochran's house. Garner got back home shortly after the gun fired.

Cross-examined, witness said that he was in Garner's house during the latter's absence. He paid particular attention to the noises made by Garner, the dogs, and the cattle, and was able thereby to tell where the cattle were at different times. Garner occupied about an hour in getting the cows. Witness could not say exactly how long it was after the gun was fired when Garner came back.

William Crook testified, for the defense, that he rented land from the defendant during the year 1885, and milked one of his cows. He turned the cow and calf out on the range on the little round prairie near Walter Cochran's house, and told the defendant about it.

Cross-examined, witness said that he did not remember exactly when he turned the calf out, but it was some time in September, and at least three or four weeks prior to the death of Pete Fowler. Witness turned the calf out because the cow would not come up from Elm swamp at night. The cow's principal range was in Elm bottom, but the witness had seen her on the little round prairie. Witness told the defendant that he had turned the cow and calf out, a week or more before the killing of Pete Fowler. Witness saw the cow and calf several times after he turned them out. He had seen them together on the little round prairie, and he had seen them together near the lot at defendant's house.

Matthew Gray testified, for the defense, that he lived about a mile from Cochran's house, and was at home on the night of October 13, 1885. He heard the running and dogging of cattle, hallooing, and ringing of cow bells in Elm bottom on that night. He heard the report of a gun fired in the neighborhood of Cochran's house on that night. Witness had known the defendant for thirteen years. He had never known defendant to use an oath or by words, or to utter such an expression as "son-of-a-b—h." Defendant's reputation was that of a good, peaceable, law abiding citizen.

Cross-examined, witness said that he had been told that defendant and one Spears had trouble about rents, and that defendant and deceased disagreed about the possession of the premises occupied by deceased, and that they had a law suit about it which culminated in a fight. They had had no trouble that wit-

ness had heard of since the defendant took up his quarters at Cochran's.

E. Chester and G. W. Shahan testified, for the defense, that defendant's reputation as a quiet, peaceable, law abiding citizen was good. They testified on cross-examination substantially as did Matthew Gray. Shahan said, in addition, that he had been told that, during the fall of 1885, when deceased went to crib defendant's rent corn, defendant refused to receive it, but ordered deceased to haul it back to the field to be measured by men whom he would designate.

Charles Fowler testified, for the defense, that he was on the ground of the shooting on the morning after it occurred. Wit-ness did not put his foot in the tracks made by the party who shot Pete Fowler, and had no recollection of saying to any one that his foot would about fit the track. Witness was present when the tracks were examined by Sol Carpenter and others. The land was sandy but retained foot prints.

Lee Spears testified, for the defense, that he farmed some of defendant's land in 1883. He and defendant had no misunder-standing. Defendant's reputation as a law abiding citizen was good.

Cross-examined, the witness said that his brother John, a ten-ant of defendant in 1882, had trouble with defendant about his tenantry, which trouble, so far as witness knew, had never been settled.

Walter Cochran testified, for the defense, that since he testified for the State on this trial, he had searched the casing above defendant's room, in his house, and found three shot only. Cross-examined, he said that he was present when Ball and Ware found the shot over the window. Witness did not put those shot over the window, and did not know who did.

J. P. Sublett testified, for the defense, that he was abroad early on the night of October 13, 1885. He crossed Hickory creek just at dusk. He met two men about a half mile from where he crossed the creek, and passed them at very close quarters, but could not recognize them. He afterwards learned that one of the men was an old acquaintance. Witness could not recognize people out of doors on that night.

Cross-examined, witness said that he was sixty-five years old. His eye sight was not good; he could not see well at night, and had to use glasses to see well in the day time.

C. A. Williams testified, for the defense, that he had known

the defendant for about thirteen years, and done business with him for about ten years. Defendant was very honest, and was a good, law abiding citizen, and such was his reputation. Witness had heard of defendant having trouble and law suits with Willard and Burns. Witness had no recollection of doing so, but may have told E. C. Smith that defendant stirred up more trouble than any ten men in his neighborhood. The defense closed.

Dave Ware, recalled by the State, testified that he started to Cooke county, to attach Garner Coleman as a witness in this case, on the day after the postponement of the trial. He took Reese Thomas with him. They reached Coleman's house about sun rise the next morning, and started back to Denton with him. Before crossing the Cooke county line, Garner Coleman asked what he was wanted for. Thomas told him that he was wanted as a witness for Matt Smith, and repeated what the defendant's counsel claimed they would prove by him. Garner said that he would testify to no such facts. About three miles of Denton, Thomas and Garner got to talking about the substance of the application for continuance made by defendant's counsel, and Thomas said that he believed that the man who signed that application would be arrested as an accomplice to the murder of Pete Fowler. Thomas told him that old man Fowler had seen the statement, and was threatening to cause his, Garner's, arrest as an accomplice if he swore to that statement. Denton was reached about noon on Wednesday before the trial commenced on Thursday. After getting dinner, witness took Garner to the court house to be recognized. County attorney Ferguson met Garner in the court house, and took him into the counsel room and talked to him.

Reese Thomas, recalled by the State, corroborated the testimony of Dave Ware, and testified to some additional immaterial matters.

County attorney Ferguson testified, for the State, that on Tuesday preceding this trial, he met Garner Coleman in the court house, and knowing him to be the witness for whom the defense had asked a continuance, invited him into the counsel room. He then asked Garner to state what his evidence would be. Garner then told witness what he said he knew. Witness did not attempt to intimidate him, nor did he intimate to him in any way what his testimony might be. He did not appear in

the least excited or embarrassed, but voluntarily stated what his testimony would be.

The ruling of this court, stated in the tenth head note of this report, relates to the exclusion of certain testimony set out in the ninth, tenth, and eleventh bills of exception. The ninth bill of exception complains of the action of the trial court in refusing to permit the defendant to prove by the witness J. E. Coleman, that he remained at Garner Coleman's house while Garner was gone after his cows, because Mrs. Garner Coleman was afraid to remain in the house alone.

The tenth bill of exception complains of the refusal of the trial judge to permit the defense to prove by R. H. Bates, attorney at law, that he saw Reece Thomas and Garner Coleman in the court house in Denton, on Wednesday, January 27, 1886 (the day prior to this trial); that the said Coleman said that he was then a prisoner in the custody of the said Thomas, and that the said Thomas said that he was holding and guarding the said Coleman by order of the county attorney.

The eleventh bill of exception complained that the court refused to permit the defense to prove by Matthew Gray that his three children were in Midlothian, Ellis county, Texas, on the thirteenth day of October, 1885, the object of said proof being to show the whereabouts of said children, and thereby explain defendant's inability to account for his presence at the time of the shooting, and the presence of the certain shot and the Hazle letter found in the defendant's room.

The thirteenth head note of this report relates to the matter brought up in the defendant's thirteenth bill of exception. That bill, omitting the formal part, reads as follows:

*    *    *    *    "E. C. Smith, one of the counsel for the State, in his closing argument to the jury, said: 'A. W. Robertson, one of defendant's counsel, asks you in his speech: 'Why did not the State prove the dying declarations of Pete Fowler?' His statements when about to die would have been more worthy of belief than one made under excitement, as was that in the presence of Helms and others, when he first went to Helms's house.' Mr. Smith then proceeded: 'In reply to that, I call your attention to the evidence in the case. The State placed Doctor Williams, one of the attending physicians, on the stand, and by him proved, without objection on the part of defendant's counsel, that Pete Fowler, fifteen minutes before he died, did make a statement as to who shot him and how the same was done, and

offered to prove what that statement was, but the defendant's counsel objected to the proof. Now, I ask you, if that statement was more reliable and was different from that made to Helms and Garrett, why did they object to the proof? I think this a sufficient answer to Mr. Robertson's question. I leave the matter to you to construe as you please.' "          *          *          *

The motion for new trial raised the questions discussed in the opinion.

*Owsley & Walker* and *A. W. Robertson*, filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. 1. Defendant's motion to quash the indictment was properly overruled, it being in the usual form for murder in the first degree, and sufficiently specific in its allegations. (Willson's Crim. Forms, No. 388, p. 173.)

2. Defendant made a motion for a change of the venue. One Crutcher made affidavit controverting the two compurgators' means of knowledge of the facts stated by them in their affidavit in support of the motion. Exceptions to the sufficiency of his affidavit were made by the defendant upon the grounds: 1. That his affidavit did not attack the credibility of said compurgators. 2. It does not sufficiently controvert the compurgators' means of knowledge, by stating facts showing they were mistaken or misinformed as to the case. 3. Because the affiant, Crutcher, was not himself such credible person as the law requires to raise this issue, for the reason that he was the physician who attended deceased in his last illness, is a witness for, and interested in the prosecution of the cause.

Article 583 of the Code of Criminal Procedure provides that the credibility of the persons making affidavit for a change of venue, or their means of knowledge may be attacked by the affidavit of a credible person, and the issue thus formed shall be tried and determined by the judge, granted or refused, as the law and facts shall warrant. Two modes are thus provided for controverting the motion: 1. By attacking the credibility of the compurgators. 2. By attacking their means of knowledge. Either one of these two grounds is, of itself, sufficient without the other to form the issue to be tried. (Davis v. The State, 1 Texas Ct. App., 201; Carr v. The State, Id., 635; and Pierson v. The State, *ante,* p. 14.)

The controverting affidavit, in this instance, was sufficiently explicit in its statements traversing the means of knowledge of said compugators. As to the last ground of the motion, to-wit, the fact as to whether or not the controverting affiant, Crutcher, was himself a credible person, this was a matter to be ascertained and determined by the judge in the court below. There is not a particle of testimony, one way or another, in this record with regard to his credibility. The fact that he was a physician who attended the deceased in his last illness, nor the fact that he was a witness for the State in the case, would certainly neither, in themselves, tend to establish that he was not a credible person; nor would they tend in the slightest degree to disprove the statements made by him in his controverting affidavit. The court did not err in overruling the motion for a change of venue.

3. A motion was also made to quash the special *venire*. As ground for this motion it is stated that the names for the special *venire* were not drawn in open court from the names selected by the jury commissioners to do jury service for the term, as is required by the statute (Art. 610, Code Crim. Proc.); and because it appears from the return of the sheriff thereon, that one of the sixty men named in the *venire* was dead, and that another was in the Indian Territory at the time said *venire* was ordered, and that therefore the same was not a *venire* for sixty men, as ordered by the court.

With regard to the first ground of the motion there is no testimony going to show whether the selecting of the special *venire* was had by drawing the names, in open court, of persons selected by the jury commissioners to do jury service, or not. Where there are no jurors selected by the jury commissioners as provided in Article 610, Code of Criminal Procedure, then the court can order the requisite number of jurors to be summoned from the body of the county. (Code Crim. Proc., Art. 611; Weaver v. The State, 19 Texas Ct. App., 547.) Inasmuch, however, as the writ of special *venire* in the case required the sheriff to summon the sixty persons whose names appeared on the list attached to the writ, we think it is sufficiently manifest that these sixty men had already been selected before the writ issued; and we will further presume, in the absence of any thing to the contrary, that they had been selected in the manner required by law—that is, that they had been drawn from the selected jurymen for the term in open court.

As to the objection to the two venire men named on the list,

that one was dead, and that one was in the Indian Territory, it may have been, and doubtless was, impossible to know these facts when the *venire* was ordered, and we can not well see how such unforeseen contingencies can well be guarded against or avoided. Such objection is not sufficient to authorize nor warrant the quashal of the *venire.* It was not error to overrule the motion to quash.

There is no merit in appellant's third bill of exceptions. The bill itself shows that when the names of jurors who had already been passed upon on the original *venire* were reached on the call of the second special *venire,* they were made to stand aside by the court, and neither the State nor the defendant was required to challenge or pass upon them.

4. We are of opinion that the appellant was sufficiently arraigned in the court below before the trial was proceeded with. (Code Crim. Proc., Arts. 509, 512, and 516; Willson's Crim. Forms, 685, p. 321.) The recitals of the entry of the arraignment render it clear that the indictment must have been read to the appellant before he was required to plead thereto, and this is, substantially, all that the statute requires with regard to the entry of the fact upon the minutes.

5. Appellant's fourth and fifth bills of exception have reference to the admission in evidence of a certain diagram of the *locus in quo,* drawn by the witness Ball. It is insisted that the diagram was not properly admitted in evidence. Its correctness had already been testified to by the witness Ball, before it was introduced in evidence, and before it was used by the other witnesses in connection with their testimony. Mr. Wharton says: "We have already had occasion to observe that parol evidence may be received of buildings, monuments, and other objects which can not be brought into court. For this purpose, authenticated plans or diagrams of the *locus in quo* are admissible." (Wharton's Crim. Ev., 8 ed., sec. 545; Gavignan v. The State, 55 Miss., 532.)

6. Over objections of defendant, as shown by the sixth and seventh bills of exception, the prosecution was permitted to prove, by the witnesses James Garrett and L. R. Helms the statements made by the deceased to them within some ten or fifteen minutes after he was shot, as to how and by whom he was shot. Under the facts detailed by the witnesses, in connection with the making of these statements, they were properly admitted as *res gestœ.* They sprang out of the

principal fact, tended to explain it, were voluntary and spontaneous, and were made at a time so near, and under such circumstances as to preclude the idea of deliberate design, and so may be regarded as contemporaneous. (Booth v. The State, 4 Texas Ct. App., 203; Foster v. The State, 8 Texas Ct. App., 248; Stagner v. The State, 9 Texas Ct. App., 441; Warren v. The State, 9 Texas Ct. App., 619; Hobbs v. The State, 16 Texas Ct. App., 517; Pierson v. The State, 18 Texas Ct. App., 524; Pierson v. The State, *ante*, p. 14.)

7. As shown by defendant's ninth bill of exceptions, Rudolph Gray, a child ten years old, was placed upon the stand and examined as a witness for the State, and cross-examined by the defendant. On his re-examination by the State, he was asked the question: "Did not your uncle, Walter Cochran, tell you, in presence of the defendant, to wait until your mother came home the next morning, and she would tell you what to say about the shot?"

This witness, on his examination in chief, had stated that he and his uncle Walter and his little brother were together at the house of his uncle Walter when the shot was fired; that about two minutes after he heard the gun fire, the defendant stepped into the room where they were, and witness asked him if he had heard the gun fire, and he said that he did; that whilst defendant was in the room, he, defendant, told his uncle Walter something, but the witness says: "I do not remember what uncle Walter told me about it." It was then and in this connection that the question objected to was asked the witness.

We do not think that the question was objectionable under the circumstances shown. Whatever his uncle told him was or is shown to have been the result of what had transpired between defendant and his uncle with regard to the firing of the gun; and whatever his uncle told him about the matter was told him in the presence of the defendant, and presumably at his instance or suggestion. In his explanation to this bill of exception, the learned trial judge says: "Had the objection been made that it (the question) was leading, I should have sustained it, unless the State's counsel had stated that he was seeking to lay a predicate for contradicting the witness."

8. Appellant's ninth, tenth, and eleventh bills of exception relate to the exclusion of evidence proposed by the defendant. This evidence was excluded because irrelevant and immaterial, and we are clearly of opinion that the court did not err in ex-

cluding the same upon the ground stated. The proposed evidence could not possibly have thrown any light upon the transaction.

9. Appellant's twelfth bill of exceptions relates to the action of the court in refusing to permit counsel for the defendant to read, as part of his argument to the jury, certain rules of law with regard to circumstantial evidence as contained in Black's case, 1 Texas Court of Appeals, 391, and Willson's Circumstantial Evidence, rule 5, page 175. It is a rule established now by repeated decisions in this State, that the extent to which counsel may read to the jury from books as part of their argument to the jury is a matter left largely in the discretion of the trial judge, and one which will not be revised on appeal unless that discretion has been clearly abused to the prejudice of the appellant. (Wade v. De Witt, 20 Texas, 398; Dempsey v. The State, 3 Texas Ct. App., 430; Hines v. The State, Id., 596; Foster v. The State, 8 Texas Ct. App., 248; Harrison v. The State, Id., 183; Cross v. The State, 11 Texas Ct. App., 184; Lott v. The State, 18 Texas Ct. App., 627.)

In this case no material error could possibly have inured to the defendant by a failure to have the jury instructed with regard to the rules applicable to circumstantial evidence. The case was not one wholly of circumstantial evidence, because, in the statements of the deceased, made within a few moments after the shooting, he positively and emphatically stated that the defendant on trial was the party who did the shooting. But, even had the case been one of circumstantial evidence, the ruling of the court in excluding, or in refusing to permit counsel to read, as stated in the bill of exceptions, could possibly have worked no injury to defendant in this case, because we find that the jury were fully and sufficiently instructed with regard to the rules of law applicable to a case of circumstantial evidence, in the thirteenth paragraph of the charge of the court.

10. Defendant's thirteenth bill of exceptions was reserved to certain remarks made in the closing argument of the counsel for the State. These remarks and argument were provoked and induced by the argument made by defendant's counsel in his address to the jury, and were perfectly legitimate, and were based upon facts in evidence, and under the circumstances shown the appellant certainly has no ground to complain.

11. Appellant's fourteenth and fifteenth bills of exception were taken to the entire charge of the court as given to the jury,

and the refusal of the court to give the requested special instructions asked for the defendant. It is unnecessary, and we do not propose to go into a discussion of these exceptions. No material error is pointed out in the main charge. It was, in our opinion, a full and fair presentation of the law as applicable to all the substantial phases of the case. In so far as they presented the law it was unnecessary that the court should give defendant's special requested instructions, and there was no error in refusing them.

12. The sixteenth and last bill of exception was taken to the action of the court in overruling defendant's motion for a new trial. In discussing the questions presented by previous bills of exception, we have already disposed of the grounds upon which this motion is based, and it is unnecessary further to elaborate them. It was not error to overrule the motion.

It only remains for us to say that the evidence in this case is amply and conclusively sufficient to establish the guilt of appellant of murder in the first degree, as found by the jury—a cold blooded assassination, committed at night, with premeditated design, and by lying in wait. The judgment is in all things affirmed.

*Affirmed.*